**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

**UNITED STATES OF AMERICA,**

**v.**

**FLOYD BARROW,**

**Defendant.**

**CRIMINAL ACTION FILE
NO. 1:23-CR-00236-JPB-JEM**

### UNITED STATES MAGISTRATE JUDGE'S
### NON-FINAL REPORT AND RECOMMENDATION

Pending before the Court are eight motions filed by Defendant. (Docs. 21-25, 75.) For the following reasons, the Court **RECOMMENDS** that:

- Defendant's Motion to Suppress Evidence, (Doc. 20), be **DENIED**;

- Motion and Amended Motion to Suppress Statements, (Docs. 21, 25), be **DENIED**;

- Preliminary Motion to Dismiss Indictment Based on *Bruen*, (Doc. 22), be **DENIED**;

- Motion to Suppress Evidence Obtained through Execution of Search Warrants, (Doc. 23, 74), be **DENIED**;

- Motion and Amended Motion to Dismiss Indictment for Lack of Jurisdiction, (Docs. 24, 75), be **DENIED**; and

- Motion to Suppress Evidence Obtained through Execution of Search Warrant at Defendant's Residence, (Doc. 26), be **DENIED.**

## I.     INTRODUCTION

Barrow was indicted on July 18, 2023, for a single count of possession of a machinegun in violation of 18 U.S.C. § 922(o). (Doc. 10.) He initially filed the pretrial motions that are the subject of this brief on August 24 and 29, 2023. (Docs. 20, 21, 25, 26.) This Court held a hearing on those motions on November 9, 2023. (Doc. 40.) The factual history of this matter set forth below is based on the testimony and exhibits admitted at that hearing.

### A.     Traffic Stop and Vehicle Inventory Search

At approximately 2:50 a.m. on April 8, 2023, Defendant was driving down Hemphill Avenue in Fulton County, Georgia. (Gov. Ex. 1; Def. Ex. 3; Doc. 62, Transcript of Proceedings as to Defendant held on November 9, 2023, "Tr." at 7:6-11.)[1] The sun had set, but Defendant had not activated his headlights. (Tr. at 7:14-18.)[2] At that time, Georgia Tech Police Department ("GTPD") Officer Kurtis Bransford was on routine patrol and executed a traffic stop on Defendant. (Tr. at 6:22-25, 7:10-11.)

As Ofc. Bransford approached the driver's side of Defendant's vehicle, Defendant held his driver's license out of the window for Ofc. Bransford to take. (Gov. Ex. 1 at 0:30-40; Tr. at 7:24-8:4.) As Defendant was handing Ofc. Bransford his driver's license, Ofc. Bransford observed what he believed to be a second

---

[1] The Court will cite to the pages of the Transcript rather than the pages of the document.

[2] Driving after dark without headlights is a violation of the Georgia Motor Vehicle Code. O.C.G.A. § 40-8-20 ("Every vehicle upon a highway within this state at any time from a half-hour after sunset to a half-hour before sunrise . . . shall display lights. . . ."); (Tr. at 7:21-23).

driver's license in Defendant's wallet. (Gov. Ex. 1 at 0:45-0:48; Tr. at 8:3-4.) He asked Defendant to give him the second license, and Defendant complied. (Gov. Ex. 1 at 0:55-1:01.) Ofc. Bransford went back to his vehicle to investigate the two driver's licenses, (*id.* at 1:01-5:18), and he discovered that the second license was issued to someone other than Defendant and had an active license number that was traced to a third individual, (Tr. at 10:1-24). This led Ofc. Bransford to believe that Defendant might have been committing identity theft, a crime under Georgia law. (Tr. at 11:2-7.) Additionally, the registration for Defendant's vehicle was invalid. (Tr. at 11:21-23.)[3]

During this time, GTPD Ofc. Jonathan Jornlid arrived on the scene and approached Defendant's vehicle. (Gov. Ex. 2 at 0:00-0:46.) Defendant requested to step out of his car, which Ofc. Jornlid allowed. (*Id.* at 0:47-1:56.) Defendant then asked Ofc. Jornlid not to tow his car and stated that his car insurance was invalid. (*Id.* at 3:27-3:36.)[4]

---

[3] Operating a motor vehicle without a valid registration is a crime in Georgia. O.C.G.A. § 40-2-20(a)(1)(A) ("[E]very owner of a motor vehicle . . . shall, during the owner's registration period in each year, register such vehicle as provided in this chapter."); (Tr. at 11:24-12:1).

[4] Operating a motor vehicle without valid insurance is a crime under Georgia motor vehicle code. O.C.G.A. § 40-6-10 ("The owner or operator of a motor vehicle for which minimum motor vehicle liability insurance coverage is required under Chapter 34 of Title 33 shall keep proof or evidence of required minimum insurance coverage in the vehicle at all times during the operation of the vehicle."); O.C.G.A. § 33-34-4 ("No owner of a motor vehicle required to be registered in this state or any other person, other than a self-insurer as defined in this chapter, shall operate or authorize any other person to operate the motor vehicle unless the owner has motor vehicle liability insurance…"); (Tr. at 11:10-12).

At approximately 2:58 a.m., Ofc. Bransford went back to Defendant's vehicle and told Defendant about the status of his second driver's license and that they would not tow his car if he was able to show proof of current, active insurance before the tow truck arrived. (Gov. Ex. 1 at 5:25-8:40.) Ofc. Bransford then returned to his vehicle to further investigate the licenses. (Gov. Ex. 1 at 8:47-12:47.) During this time, Defendant spoke with Ofc. Jornlid and attempted to acquire insurance for his vehicle using his cell phone. (Gov. Ex. 2 at 7:50-13:36; Tr. at 22:6-15, 36:21-37:1, 40:16-19, 41:18-23, 50:3-6; *see* Tr. at 11:8-9.)

At approximately 3:07 a.m., after consulting with GTPD Sgt. Igor Leao about Defendant's second driver's license, Ofc. Bransford attempted to arrest Defendant for identity theft. (Gov. Ex. 1 at 12:50-14:43; Tr. at 11:15-20; 12:2-7.) Defendant resisted the arrest attempt, leading to Ofc. Bransford being injured and ending his participation in the arrest. (Gov. Ex. 1 at 14:43-17:00; Tr. at 12:7-12.) As Defendant was being placed in handcuffs, he repeatedly asked the officers, "What did I do? Can y'all tell me what I did?," and at one point he said, "Please talk to me!" (Gov. Ex. 1 at 15:10-18:02.) After the arrest was completed, Defendant was placed in the back seat of Ofc. Jornlid's GTPD patrol vehicle at approximately 3:10 a.m., at which time Sgt. Leao told Defendant why he was under arrest. (*Id.* at 17:40-18:00; Gov. Ex. 6 at 7:36-8:43; Tr. at 43:8-10.) Specifically, Sgt. Leao said, "You're being placed under arrest for obstruction, battery, and possession of false ID." (Gov. Ex. 1 at 17:50-18:03.) Sgt. Leao then got into the driver's seat of Ofc. Jornlid's patrol vehicle, and Defendant initiated a conversation about his arrest. (Gov. Ex. 6 at 3:45-4:20.) Sgt. Leao left the vehicle for about three minutes; when he came back at around 3:14 a.m., he opened the

driver's door and Defendant immediately asked for Sgt. Leao to talk to him. (*Id.* at 4:20-7:32.) Sgt. Leao closed the door and retrieved his GTPD-issued *Miranda* warnings card. (*Id.* at 7:32-7:52.) He opened the driver's door again, and Defendant again asked to talk to him. (*Id.* at 7:52-8:00.) Sgt. Leao then opened the backseat passenger door and read Defendant his *Miranda* warnings verbatim from his GTPD-issued card. (*Id.* at 7:32-8:43; Tr. at 79:18-24, 81:6-13.) Defendant stated that he understood his rights and that he did not want to speak further with the GTPD officers. (Gov. Ex. 6 at 8:35-8:44; Tr. at 80:2-3.) He then immediately asked Sgt. Leao, "What did I do?" (Gov. Ex. 6 at 8:44-8:53.) Sgt. Leao asked again, "You don't want to talk to us?," to which Defendant responded, "No. What did I do?" (*Id.*) Sgt. Leao told him that if he does not want to talk to them, then they cannot talk to him. (*Id.*) Defendant asked Sgt. Leao again, "What . . . did I do?," and Sgt. Leao closed the car door. (*Id.*) Around 3:20 a.m., Sgt. Leao opened the front passenger door of Ofc. Jornlid's vehicle, and Defendant attempted to initiate a conversation with him, but Sgt. Leao did not respond. (*Id.* at 13:20-13:40.)

During this time, Ofcs. Jornlid and Demetrius Johnson conducted an inventory search of Defendant's car because they had decided to impound it pursuant to their written inventory policy. (Tr. at 15:11-23, 43:11-44:10, 45:6-22.) Defendant's vehicle was not covered by valid insurance, was blocking a roadway and bike lane, and Defendant had been arrested with no other legal driver present. (Tr. at 44:6-45:5, 83:8-13) (Defendant's passenger could not have legally driven the vehicle, and Defendant never attempted to put the vehicle in her custody). During the inventory search of Defendant's car, Ofc. Jornlid found a

portable scale with suspected marijuana residue on it in the glove compartment, and Ofc. Johnson found a switch-modified Glock handgun under the driver's seat. (Tr. at 30:10-12, 45:23-46:2, 54:16-18, 56:18-20.) After the inventory search, Ofc. Jornlid completed the incident report and Ofc. Johnson completed the inventory paperwork, which is known as a VINS report. (Tr. at 46:9-16.)

Around 3:24 a.m., Defendant initiated a conversation with Sgt. Leao while still sitting in the patrol vehicle, asking if anyone was going to talk to him, and Sgt. Leao responded, "You said you didn't wanna talk to us." (Gov. Ex. 6 at 17:08-17:21.) Defendant continued the conversation about why he was pulled over and arrested, which Sgt. Leao ended by shutting the door. (*Id.*) Around 3:25 a.m., Sgt. Leao got into Ofc. Jornlid's patrol vehicle to transport Defendant to GTPD. (*Id.* at 18:16.) Defendant immediately initiated a conversation with Sgt. Leao about his arrest and criminal history by saying, "Officer, is it that serious? All over a fake ID? Like, research my name, I'm good, I have no priors or nothing." (*Id.* at 18:20-18:40.) Sgt. Leao did not respond. (*Id.*) Defendant was then transported to GTPD by Sgt. Leao. (Tr. at 81:20-82:2.) They did not converse during the two-minute drive to GTPD. (Gov. Ex. 6 at 18:40-20:44.) As Defendant was being transported from the vehicle to the sallyport and as he was placed in the sallyport, he initiated conversation with Sgt. Leao about his arrest two times, first by saying, "Can y'all please, it was an accident, I didn't mean it," and then by saying, "Y'all, is it that serious?"(*Id.* at 22:00-23:11.) He made a third comment to Sgt. Leao, but it is unintelligible. (*Id.*)

While Ofc. Jornlid was at the station, he did not question Defendant. (Tr. at 47:15-18.) While Defendant was secured in the GTPD sallyport area around

approximately 4:18 a.m., Sgt. Leao spoke to Defendant for about two minutes. (Gov. Ex. 7 at 0:35-3:20; Tr. at 47:15-22, 83:17-23.) Sgt. Leao began by asking Defendant if he remembered the *Miranda* warnings read to him earlier, and Defendant stated that he did. (Gov. Ex. 7 at 0:35-0:42; Tr. at 84:17-19.) Sgt. Leao then asked Defendant if he was still willing to talk, and Defendant stated that he was. (Gov. Ex. 7 at 0:35-0:42; Tr. at 84:20-21.) Sgt. Leao then began questioning Defendant about the gun, his job, and prior offenses, all of which Defendant responded to verbosely. (Gov. Ex. 7; Tr. at 84:22-23.) Defendant also asked Sgt. Leao several questions, including "What's my priors? . . . You're talking about just now, right? . . . Do you know how expensive California is to live?" (Gov. Ex. 7.) Sgt. Leao and Defendant also had the following exchange about the seriousness of the charges Defendant was facing:

> Sgt. Leao:     So look, man, here's the bottom line of it. What you got over there was in your possession in your vehicle at the time. . . . Right now you're looking at federal charges, federal felony charges, being picked up by the ATF. Do you know who that is?
>
> Defendant:    Bro, I've never done nothing, though.
>
> Sgt. Leao:     Do you know who the ATF is?
>
> Defendant:    Alcohol, tobacco, and something else, right?
>
> Sgt. Leao:     Yeah. That right there, what you got on that gun, is a Glock switch.
>
> Defendant:    That's not even, I don't own a gun.

Sgt. Leao:     So tell me the truth about it because you're looking at some

serious time, my man. You're looking at federal charges. . . .

So what's going to happen is, if you don't give us any

information about it, things are gonna be looking a lot worse,

right? So, federal felony charges, so think about that.

(*Id.* at 1:29-2:37.)

After Sgt. Leao began walking away from Defendant to end the
conversation, Defendant continued talking, including asking Sgt. Leao to talk to
him, until Sgt. Leao closed the door to the sallyport. (Gov. Ex. 7 at 3:11-3:22.)
Around 4:23 a.m., Sgt. Leao returned to the sallyport to speak to Defendant.
(Gov. Ex. 8 at 0:31.) As soon as Sgt. Leao opened the door, Defendant began
asking questions and providing information about someone named "Q" who
may have left the gun in his car, which lasted for about 30 seconds. (*Id.* at 0:32-
1:03.) Sgt. Leao asked why Q would want to leave a gun in his car, (id. at 1:03-
1:05), and Defendant responded uninterrupted for more than a minute, (*id.* at
1:05-2:12). When Sgt. Leao told Defendant that they were done talking and began
walking toward the door, Defendant responded, "Please, man! Officer, what else
can I give you besides that person?" (*Id.* at 2:55-3:05.) Sgt. Leao did not respond
and exited the sallyport. (*Id.*) Around 4:26 a.m., Sgt. Leao returned to the
sallyport to get Defendant's permission to unlock his phone, which Defendant
gave. (Gov. Ex. 9 at 0:15-0:25.) After Defendant could not unlock the phone with
face ID or a passcode, he stated, "I'm a little tipsy right now." (*Id.* at 0:25-1:04.)
Sgt. Leao then questioned Defendant about the gun for about two minutes and
then left the sallyport. (*Id.* at 1:05-3:11.) Around 4:31 a.m., Sgt. Leao returned to

speak to Defendant about his criminal history, and he was holding several pieces of paper. (Gov. Ex. 10 at 0:29-0:36.) Defendant spoke first, asking, "More rights and shit like that, man?" (*Id.* at 0:36-0:38.) They went through his criminal history for about four minutes, and then Sgt. Leao left the sallyport. (*Id.* at 0:38-4:26.) Around 5:06 a.m., Sgt. Leao went back into the sallyport, and Defendant began talking again about Q. (Gov. Ex. 11 at 0:27-1:06.) Defendant then asked Sgt. Leao, "What can I do to save myself, to not ruin my life?," to which Sgt. Leao responded that there was not much he could do without more information. (*Id.* at 1:06-2:00.) As Sgt. Leao was exiting the sallyport, Defendant asked, "That's it? I can't do anything to save myself, to help myself? Can you talk to me about some more things real quick? . . . Can you just tell me what it's looking like?" (*Id.* at 2:13-2:33.) Sgt. Leao told him they would go over it later, and he closed the door. (*Id.* at 2:34-2:40.)

At no point during any of these conversations did Defendant invoke his right to silence or his right to counsel. (Gov. Exs. 7-11; Tr. at 84:24-85:5.) Around 5:15 a.m., Defendant attempted to escape. (Gov. Ex. 12.) As Sgt. Leao and Ofc. Jornlid were placing Defendant back into handcuffs, Defendant began talking to them and asking repeatedly, "Can y'all hear me out? Can we talk or something?" (*Id.* at 0:33-1:00.) Defendant then asked if he could call his lawyer, and Sgt. Leao responded that they were done talking. (*Id.* at 1:00-1:03.) Neither Sgt. Leao nor Ofc. Jornlid questioned Defendant about his offenses thereafter. (*Id.* at 1:03-1:50.)

Ofcs. Jornlid and Sgt. Leao testified to their belief that Defendant was intoxicated, (Tr. at 40:24-41:1 (Jornlid), 85:23-86:3 (Leao)), but they and Ofc. Bransford also testified that Defendant was able to ask questions, answer

questions, and follow a conversation, (Tr. at 13:1-10 (Bransford); 40:24-41:17 (Jornlid); 86:4-21 (Leao)). Neither Ofc. Jornlid nor Sgt. Leao saw Defendant consume any intoxicants while in custody. (Tr. at 48:21-22, 86:22-24.) Defendant's conversations with Sgt. Leao at GTPD took place between approximately 90 minutes and 150 minutes after the traffic stop. (*See* Gov. Exs. 7-12.) Defendant was not threatened during his interactions with any GTPD officers, (Tr. at 13:11-12 (Bransford); 48:12-17 (Jornlid); 85:6-10 (Leao)), and none of them made Defendant any promises regarding the outcome of their investigation, (Tr. at 13:13-15 (Bransford); 48:18-20 (Jornlid); 85:18-22 (Leao)).

    **B.**    <u>**Interview with Bureau of Alcohol, Tobacco, and Firearms Officers**</u>

    Sergeant Soper of the GTPD Criminal Investigations Division contacted Carlos Maldonado, a Task Force Officer ("TFO") with the Bureau of Alcohol, Tobacco, and Firearms ("ATF"), to aid in the investigation of the switch-modified Glock found in Defendant's vehicle. (Tr. at 100:6-12.) TFO Maldonado tested the firearm, and it came back with a presumptive lead in the National Integrated Ballistics Information Network (NIBIN) that the firearm was connected to two shooting incidents in California. (Tr. at 100:13-24.) This lead prompted TFO Maldonado to research Defendant because he had possessed the firearm, and TFO Maldonado discovered that Defendant was from California. (Tr. at 100:25-101:4.) As a result, on June 27, 2023, TFO Maldonado and Special Agent ("SA") Larry Bazin traveled to Defendant's apartment to conduct a "knock-and-talk" interview for the purpose of gathering more information about the firearm. (Tr. at 98:12-13, 101:7-12.) The interview was recorded by TFO Maldonado on his cell phone. (Tr. at 102:2-6; Ex. 13.) TFO Maldonado and SA Bazin knocked on

Defendant's door around mid-day. (Tr. at 104:5-18, 105:25-106:6.) Other than Defendant, no one else was present for the interview. (Tr. at 106:7-10.) The two officers were in plain clothes, though TFO Maldonado wore his badge and SA Bazin wore an ATF vest, and both carried firearms. (Tr. at 104:1-105:5.) The entirety of this interaction lasted approximately 15 minutes. (Tr. at 110:22-24; Gov. Ex. 13.) Defendant was not read his *Miranda* warnings or told that he was in custody during this meeting. (Tr. at 109:6-10; Gov. Ex. 13.) TFO Maldonado did not threaten Defendant during the interview. (Tr. at 105:6-10; 109:14-16; Gov. Ex. 13.) After TFO Maldonado and SA Bazin greeted Defendant at the door to his apartment, Defendant sat down on the ground in the doorway. (Tr. at 106:24-107:3.) This prompted SA Bazin to suggest that the three move the meeting inside the apartment. (*Id.*) The bulk of the meeting took place standing around Defendant's kitchen counter, with TFO Maldonado and SA Bazin on one side and Defendant on the other. (Tr. at 108:16-109:5.) While Defendant appeared to have just woken up, he did not give any indications of being intoxicated or mentally impaired. (Tr. at 107:4-16; 107:24-108:15.) Defendant never asked the officers to leave, did not refuse to answer any questions, and did not ask for a lawyer. (Tr. at 109:11-23, 112:20-22.) The conversation was generally friendly—no anger was expressed in either direction and laughter occurred on both sides. (Tr. at 110:7-12; Gov. Ex. 13.) At a certain point, SA Bazin informed Defendant that the potential penalty for possession of a machinegun in violation of federal law could be 5 years' incarceration, and that he could receive an additional 10 to 15 years for the California shootings to which gun was suspected to be connected. (Tr. at 130:12-15; Gov. Ex. 13 at 12:23-31, 14:05-26.) He also advised Defendant

that the officers did not want to "mess up his life" or cause Defendant to have a federal conviction. (Tr. at 131:3-6; 131:15-19; Gov. Ex. 13 at 13:05-13:27.) The agents explained that, "the more you can help us, the better it looks." (Gov. Ex. 13 at 12:42-44.) Toward the end of the interview, Defendant asked TFO Maldonado if he would leave a business card to aid in future contacts. (Tr. at 111:16-112:4; Gov. Ex. 13 at 12:59-13:04.)

At the time of the knock-and-talk, no federal charges were pending against Defendant, and the case had not yet been presented to the United States Attorney's Office. (Tr. at 112:5-9.) There were state charges pending against Defendant related to the traffic stop and possession of a machinegun. (Tr. at 112:10-11, 122:6-14.) Sergeant Soper's referral of the case to ATF through TFO Maldonado was the only contact between state and federal law enforcement on the matter to that point. (Tr. at 100:6-16; 112:15-19.) TFO Maldonado was not acting at the direction of the state when he conducted the knock-and-talk. (Tr. at 112:12-14.)

## C.   <u>Defendant's Arrest by ATF Officers</u>

Defendant was arrested by TFO Maldonado and other ATF agents and local police officers on June 30, 2023. (Tr. at 114:8-115:7, 132:8-11; Gov. Ex. 14.) That arrest was based on a federal complaint and associated arrest warrant. (Tr. at 114:2-12; Docs. 1, 13.) The arrest took place shortly after 6:00 a.m. at Defendant's apartment. (Tr. at 114:13-115:7.) At the time of his arrest, Defendant did not appear intoxicated and was able to carry on a conversation. (Tr. at 116:14-117:4.) After he was taken into custody, Defendant was placed into TFO Maldonado's car for transportation to an ATF office. (Tr. at 115:7-20.) Defendant

was not read his *Miranda* warnings. (Tr. at 117:5-8.) None of the officers threatened Defendant. (Tr. at 117:9-12.)

Defendant's arrest and transportation were recorded on TFO Maldonado's body camera ("bodycam"). (Tr. at 115:2-4; 115:22-24; Ex. 14.) Defendant and TFO Maldonado were alone in TFO Maldonado's car for the duration of his transportation to ATF. (Tr. at 117:13-15.) During this trip, TFO Maldonado did not ask Defendant any substantive questions related to the investigation. (Tr. at 118:8-9.) Once they arrived at the ATF office, TFO Maldonado and Defendant were met by SA Brian Moore. (Tr. at 118:10-13.) At that point, TFO Maldonado stopped the recording on his bodycam per the policy of his original agency, the Atlanta Police Department. (Tr. at 115:25-116:10.) After arriving at the ATF offices, TFO Maldonado and SA Moore escorted Defendant to an interview room for purposes of completing some paperwork. (Tr. at 118:10-15.) The room was approximately six feet by six feet and contained a chair and small table. (Tr. at 119:1-5.) Defendant was secured by handcuffs to a ring affixed to the table. (Tr. at 119:6-11.) During the time between Defendant exiting TFO Maldonado's car to being placed in the interview room, TFO Maldonado did not ask Defendant any questions. (Tr. at 120:3-16.) Less than five minutes elapsed between Defendant's removal from TFO Maldonado's car and Defendant's placement in the interview room. (Tr. at 120:17-19.) As TFO Maldonado was leaving the interview room, Defendant stated, "Hey, I don't know if this helps or not but I have the gun box for the firearm in my room." (Tr. at 118:18-24.) TFO Maldonado did not ask Defendant any follow-up questions to that statement, but he did say that he could not "say if it would help or it wouldn't help but [Defendant] should

probably tell his attorney that." (Tr. at 120:3-7.) To the best of TFO Maldonado's knowledge, neither SA Moore nor anyone else heard Defendant's statement. (Tr. at 119:22-120:2.) TFO Maldonado contacted an Assistant United States Attorney ("AUSA") assisting him on the case to inform him of Defendant's statement. (Tr. at 120:20-22.) Based on that statement, TFO Maldonado and the AUSA decided to seek a search warrant to retrieve the gun box. (Tr. at 120:23-25.)

> D.   **Search Warrant for Defendant's Residence**

On July 3, 2023, the government presented United States Magistrate Judge Justin S. Anand with a search warrant application and affidavit for Defendant's residence. (Doc. 70-1 at 1.) The affidavit was signed by TFO Maldonado. (*Id.*) As the basis for probable cause, TFO Maldonado recited the facts of GTPD's traffic stop of Defendant and subsequent inventory search of his car, as well as the knock-and-talk interview. (*Id.* at 4-5.) He also stated that on June 30, 2023, after Defendant was arrested, Defendant "spontaneously stated, 'I'm not sure if it'll help or not, but I have the gun box for the gun in my closet." (*Id.* at 6.) On July 3, 2023, Judge Anand signed the search warrant, (Doc. 70-1 at 9), which was then executed by TFO Maldonado and other ATF agents, (Tr. at 121:3-7). During the search, ATF seized the gun box. (Tr. at 121:5-10.)

> E.   **Search Warrants for Defendant's Cell Phones**

In addition to the residential search warrant, on June 29, 2023, the government also presented two search warrant applications and affidavits for cell phones to United States Chief Magistrate Judge Russell G. Vineyard. (Docs. 77-1 and 77-2.) The affidavits are identical and signed by TFO Maldonado. (Doc.

77-1 at 1-13; Doc. 77-2 at 1-23.) Regarding the NIBIN lead, the Affidavit stated that:

- Following GTPD's seizure of the Glock firearm bearing serial number BTER564, the firearm was test fired, and the test-fired cartridge casings were entered into the NIBIN database;

- On April 10, 2023, trained NIBIN personnel identified a NIBIN lead between the .40 caliber cartridge casings recovered from the June 25, 2021 Oakland shooting incident, the .40 caliber cartridge casings recovered from the February 26, 2022 San Francisco shooting incident, and the test-fired cartridge casings from the Glock pistol recovered from Defendant during his April 8, 2023, arrest;

- A NIBIN lead is an unconfirmed (presumptive) association between two or more pieces of firearm ballistic evidence based on a correlation review of digital images in the NIBIN database. These potential associations are identified by either a firearms examiner or a trained NIBIN technician.

- With a presumptive NIBIN lead, there is a high probability that a microscopic comparison by a firearms examiner will confirm the association between the firearm ballistic evidence.

(Doc. 77-1 at 11-12.)

The Affidavit further explained that Defendant is a former California resident who was arrested in Union City, California in 2005 and Oakland, California in 2005, 2006, 2007, 2008, and 2012. (*Id.* at 12.) Union City is 15 miles south of Oakland, which is adjacent to San Francisco. (*Id.*) During the knock-and-

15

talk on June 27, 2023, Defendant admitted to purchasing the firearm, which he knew was modified to be an automatic weapon, in August 2022. (*Id.* at 10-11.) A search of an open-source database revealed two current phone numbers, one identified by Defendant as his phone number during the knock-and-talk, and one associated with the address of Defendant's residence. (*Id.* at 12.) Judge Vineyard signed the warrants on June 29, 2023. (*Id.* at 1.)

At the evidentiary hearing, the following questions and answers were exchanged on cross-examination between defense counsel and TFO Maldonado:

Q:    And you mentioned a NIBIN lead that y'all got when you searched for information about this weapon, is that right?

A:    Yes.

Q:    And you had indicated that the leads indicated that the weapon had been involved in two shootings, is that right?

A:    That's correct.

Q:    The NIBIN leads indicate that the information provided is used for investigative purposes only, right?

A:    That is correct.

Q:    That is not reliable enough for court-related purposes, is that right?

A:    Not in and of itself.

Q:    In fact, it indicates that ballistics testing should be done as a follow-up, correct?

A:    For probable cause, that's correct.

Q:    For probable cause. And ballistics testing should be done, right?

A:    Correct.

Q:     That has not been done?

A:     It's in progress.

Q:     Right. We don't have any results back from that yet?

A:     No.

Q:     So we don't have that level of confirmation that this weapon was
       involved in any type of prior shooting, right?

A:     Well, the presumptive lead basically indicates that it's more of a
       statement of a high probability that the firearm is involved, but as
       far as an actual confirmation, no.

(Tr. at 123:6-124:19.)

## II.      DISCUSSION

### A.      Motions to Dismiss Indictment

Defendant was indicted on one charge of knowingly possessing a machine gun in violation of 18 U.S.C. §§ 922(o) and 924(a)(2). Defendant argues that his indictment should be dismissed because § 922(o) violates the U.S. Constitution in two ways.

First, Defendant argues that, based on *New York State Rifle and Pistol Association, Inc. v. Bruen*, 597 U.S. 1 (2022), Section 922(o) violates the Second Amendment. (Doc. 22 at 1.) In *Bruen*, the Supreme Court set forth the analysis by which courts must determine whether a person's Second Amendment right to bear arms has been infringed upon. 597 U.S. at 17-19. Defendant argues that his possession of a machinegun is protected by the plain text of the Second Amendment under the *Bruen* standard because the machinegun was an "arm." (Doc. 72 at 4-5.) This argument has been soundly rejected by courts in this Circuit

and by every other court that has addressed this issue. *See, e.g., United States v. Kazmende*, No. 1:22-CR-00236-SDG-CCB, 2023 WL 3872209, at *2 (N.D. Ga. May 17, 2023), *report and recommendation adopted*, 2023 WL 3867792 (N.D. Ga. June 7, 2023) (Grimberg, J.) ("Because machineguns are dangerous and unusual weapons that are outside the protection of the Second Amendment, Section 922(o) is not unconstitutional."); *United States v. Bachmann*, No. 8:23-cr-304-VMC-CPT, 2024 WL 730489, at *3 (M.D. Fla. Feb. 22, 2024) (same); *United States v. Hoover*, 2022 WL 10524008, at *13 (M.D. Fla. Oct. 18, 2022) (finding nothing in *Bruen* that "would undermine" the line of authority holding that the Second Amendment does not protect machineguns); *United States v. Dixon*, No. 22 CR 140, 2023 WL 2664076, at *3 (N.D. Ill. Mar. 28, 2023) (". . . *Bruen* foreclose[s] any challenge to the federal machinegun ban. The Second Amendment simply does not extend to 'dangerous and unusual weapons.'"); *United States v. Simien*, 655 F. Supp. 3d 540, 553 (W.D. Tex. 2023) (finding that machineguns are within the category of "dangerous and unusual" weapons that do not receive Second Amendment protection), *reconsideration denied*, 2023 WL 3082358 (W.D. Tex. Apr. 25, 2023); *United States v. Lane*, No. 3:23cr62 (RCY), 2023 WL 5663084, at *14 (E.D. Va. Aug. 31, 2023) ("The Court holds that § 922(o) withstands *Bruen*. Dangerous and unusual weapons like machineguns do not fit within the plain meaning that the Supreme Court has ascribed to 'Arms' covered by the Second Amendment."); *United States v. Kittson*, No. 3:21-cr-00075-IM, 2023 WL 5015812, at *3 (D. Or. Aug. 7, 2023) ("[P]ost-*Bruen*, courts in the Ninth Circuit and across the country have rejected challenges to the constitutionality of Section 922(o) by concluding that machineguns are dangerous and unusual weapons not protected by the plain

text of the Second Amendment."). These unanimous cases' reasoning is correct, and this Court finds no reason to deviate from those decisions.

Second, Defendant argues that Section 922(o) is not a proper exercise of Congress's power under the Commerce Clause. (Doc. 75 at 2.) Defendant acknowledges that the Eleventh Circuit Court of Appeals considered and rejected this argument in *United States v. Wright*, 117 F.3d 1265, 1268-71 (11th Cir. 1997) (analyzing and applying the Supreme Court's decision in *United States v. Lopez*, 514 U.S. 549 (1995)), *vacated in part on other grounds on rehearing*, 133 F.3d 1412 (11th Cir. 1998). Nevertheless, Defendant argues that *Lopez* and two later-issued Supreme Court cases – *United States v. Morrison*, 529 U.S. 598 (2000), and *Gonzales v. Raich*, 545 U.S. 1 (2005) – compel a different result than the one reached in *Wright*, and that the Eleventh Circuit articulated a new test in *United States v. Peters*, 403 F.3d 1263 (11th Cir. 2005), for determining whether a statute is authorized by the Commerce Clause. (Doc. 75 at 4-6.) This exact argument was thoroughly analyzed and ultimately rejected by the court in *Kazmende*. 2023 WL 3872209, at *7-8. There, the court concluded that the holding in *Wright* was undisturbed by *Morrison*, *Raich*, and *Peters*, and it therefore remains binding Eleventh Circuit precedent from which courts in this Circuit may not deviate. *Id.* ("To do away with *Wright*, there must be an *en banc* or Supreme Court opinion 'clearly on point' and which 'actually abrogate[s] or directly conflict[s] with, as opposed to merely weaken[s],' that prior case.") (quoting Gillis, 938 F.3d at 1198). This Court agrees.

Accordingly, the Court **RECOMMENDS** that Defendant's Motion to Dismiss Indictment Based on *Bruen*, (Doc. 22), and that Defendant's original and

amended Motions to Dismiss Indictment for Lack of Jurisdiction, (Docs. 24, 75), be **DENIED**.

      **B.**    **Motions to Suppress**

Defendant seeks to suppress (1) the evidence that resulted from the Georgia Tech officers' search of his wallet and vehicle during the traffic stop, (2) the statements he made to the Georgia Tech officers, (3) the evidence that resulted from the Georgia Tech officers' inventory search of his vehicle, (4) the statements he made to the ATF officers, and (5) evidence that resulted from the ATF officers' search of his home, and any evidence that may result from the search of his cell phones. The Court addresses each in turn.

      **1.**    **Evidence from Search of Defendant's Wallet and Vehicle**

Defendant argues that Ofc. Bransford's unlawful actions created a domino effect resulting in the illegal seizure of items from Defendant's vehicle. (Doc. 70 at 13.) Defendant challenges each proverbial domino, (*id.*), which the Court will address in chronological order.

First, Ofc. Bransford conducted a warrantless search of Defendant's wallet when he observed a second form of identification therein. (*Id.* at 14; Doc. 81 at 11.) Defendant argues that this warrantless search was unlawful because it constitutes an infringement upon his privacy interest in the contents of his wallet. (*Id.* at 14-15.) However, commonsense dictates that "[i]f an article is already in plain view, neither its observation nor its seizure would involve any invasion of privacy." *Horton v. California*, 496 U.S. 128, 133-34 (1990) (citing *Arizona v. Hicks*, 480 U.S. 321, 325 (1987); *Illinois v. Andreas*, 463 U.S. 765, 771 (1983)). And the evidence here shows that Ofc. Bransford observed the second

identification while Defendant held his wallet open to retrieve the first form of identification for Ofc. Bransford. Therefore, the Court finds that these circumstances make Ofc. Bransford's warrantless search of Defendant's wallet reasonable. *Kentucky v. King*, 563 U.S. 452, 462 (2011) ("[W]arrantless searches are allowed when the circumstances make it reasonable, within the meaning of the Fourth Amendment, to dispense with the warrant requirement."). *See United States v. Purcell*, 236 F.3d 1274, 1277 (11th Cir. 2001) (The Fourth Amendment of the United States Constitution protects individuals from unreasonable searches and seizures. U.S. Const. amend. IV.).

Second, Ofc. Bransford seized Defendant's second identification without a warrant when he asked Defendant to provide it to him and then carried it away from Defendant's vehicle. (Doc. 70 at 14-15.) "The plain view doctrine permits the warrantless seizure of an object when an officer is lawfully located in a place from which the object can be plainly viewed, the officer has a lawful right to access the object, and the object's incriminating character is immediately apparent." *United States v. Gant*, 756 F. App'x 898, 900 (11th Cir. 2018) (citing *United States v. Smith*, 459 F.3d 1276, 1290 (11th Cir. 2006)); *King*, 563 U.S. at 462-63 (2011) ("[L]aw enforcement officers may seize evidence in plain view, provided that they have not violated the Fourth Amendment in arriving at the spot from which the observation of the evidence is made.") (citing *Horton v. California*, 496 U.S. 128, 136-140 (1990)). Defendant argues only that the incriminating nature of his fake ID was not immediately apparent to Ofc. Bransford because he had already produced a valid ID and because Ofc. Bransford had "only seen a corner" of the fake ID. (Doc. 70 at 15.) "For an item's

incriminating character to be immediately apparent, police must have probable cause to believe the object in plain view is contraband or evidence of a crime. *Gant*, 756 F. App'x at 900 (citing *Smith*, 459 F.3d at 1290-91). "Probable cause does not require 'an officer to know with absolutely certainty that all elements of a putative crime have been completed when he seizes an article which reasonably appears to be incriminating evidence.'" *Id.* (quoting *United States v. Slocum*, 708 F.2d 587, 605 (11th Cir. 1983) (quotation omitted)). "Further, we analyze probable cause 'with a common sense view to the realities of normal life.'" *Id.* (citing *United States v. Herzbrun*, 723 F.2d 773, 775 (11th Cir. 1984)). As the government argues, by opening his wallet to remove his valid driver's license in response to Ofc. Bransford's legal demand for identification, Defendant revealed the wallet's other contents to Ofc. Bransford's view. (Gov. Ex. 1 at 0:35-1:02.) Ofc. Bransford testified that, when Defendant did so, he could see another driver's license in Defendant's wallet. (Tr. at 7:24-8:4.) This testimony is supported by Ofc. Bransford's bodycam video, which shows that he accurately identified the item as a California driver's license before receiving it from Defendant. (Gov. Ex. 1 at 0:35-1:02.) While simply possessing a second driver's license is not necessarily a crime under Georgia law, it is an action that is closely linked with various ways to commit identity theft under Georgia law. *See, e.g.,* O.C.G.A. § 16-9-121(a)(1) ("A person commits the offense of identity fraud when he or she willfully and fraudulently [] [w]ithout authorization or consent, uses or possesses with intent to fraudulently use identifying information concerning a person[.]"); *Anderson v. State*, 338 Ga. App. 802, 803 (2016); *Wilson v. State*, 276 Ga. App. 39, 39-40 (2005) (theft and use of driver's license sufficient basis for conviction of identity theft).

Additionally, individuals do not, as a practical matter, ordinarily carry two driver's licenses. (*See* Doc. 81 at 15.) Accordingly, the Court finds that Ofc. Bransford had probable cause to seize Defendant's fake ID and that this warrantless seizure was lawful.

Defendant points out that, as a result of Ofc. Bransford's search of his wallet and seizure of his fake ID, the GTPD officers arrested him, searched his vehicle, and seized the firearm therein. (Doc. 70 at 15.) Because the initial search and seizure were unlawful, Defendant argues, so too were the subsequent events. (*Id.*) Therefore, any evidence seized from Defendant's vehicle and any statements Defendant made to law enforcement in connection with and after his arrest should be suppressed. (*Id.*) (citing *Wong Sun v. United States*, 371 U.S. 471 (1963) (fruit of the poisonous tree doctrine)). This fruit of the poisonous tree argument is mooted by the Court's previous finding that Ofc. Bransford's search of Defendant's wallet and seizure of his fake ID were lawful.

### 2.   <u>Evidence from Inventory Search of Vehicle</u>

"[A] warrantless inventory search of a legally impounded car conducted pursuant to an established procedure is valid under the Fourth Amendment." *United States v. Crawford*, 294 F. App'x 466, 472 (11th Cir. 2008) (citing *South Dakota v. Opperman*, 428 U.S. 364, 372-73 (1976)). Defendant challenges the GTPD officers' inventory search of his car in two ways. Defendant first attacks the sufficiency of GTPD's impoundment policy by arguing that it (a) merely authorized rather than required them to impound his vehicle, (Doc. 70 at 19), and (b) does not guide the officers' discretion when deciding whether to impound a vehicle because it "merely lists some circumstances" under which officers may

impound a vehicle, which makes the policy too unrestrained to provide for reasonable seizures of vehicles, (Doc. 70 at 24). This argument is unpersuasive. "The Supreme Court has indicated that police may exercise discretion in deciding to impound a car 'so long as that discretion is exercised according to standard criteria and on the basis of something other than suspicion of evidence of criminal activity.'" *Crawford*, 294 F. App'x at 472 (quoting *Colorado v. Bertine*, 479 U.S. 367, 375 (1987)). "[T]he critical question . . . is not whether the police needed to impound the vehicle in some absolute sense, . . . but whether the decision to impound and the method chosen for implementing that decision were, under all the circumstances, within the realm of reason." *United States v. Handy*, 592 F. App'x 893, 907 (11th Cir. 2015) (quoting *Sammons v. Taylor*, 967 F.2d 1533, 1543 (11th Cir. 1992)) (internal quotation marks omitted).

Here, the GTPD officers decided to impound Defendant's vehicle because it was not covered by valid insurance, which Defendant admitted to during the traffic stop; it was blocking a roadway and a bike lane; and Defendant had been arrested with no other driver present who could legally remove the vehicle. Section 4.1.1(3) of GTPD's impoundment policy states that "[a]n officer is authorized to impound the vehicle of a person who is charged under [O.C.G.A. 40-6-10(a) or (b)] if such person admits to the officer that there is no insurance in effect on the vehicle[.]" (Gov. Ex. 16 at 3.) Section 4.1.3(3)-(5) of the policy states that "[i]f the driver of a motor vehicle has been arrested, the vehicle may be impounded when . . . [t]here is no one present who is authorized and capable of removing the vehicle; [t]he driver has made no specific request about the disposition of the vehicle; [or t]he driver has made no request to use a specific

towing service[.]" (*Id.*) The Court finds that the GTPD impoundment policy provides standard criteria which govern an officer's impoundment decision, and the evidence shows that the GTPD officers' decision to impound Defendant's vehicle was not based on suspicion of evidence of criminal activity. The Court also finds that the officers' decision was reasonable under the circumstances because Defendant's car was stopped on a public road in a bike lane in the early morning hours, it was not validly registered, Defendant did not make a specific request about the disposition of the car, and he did not request to use a specific towing service to remove the car.

Next, Defendant argues that the purpose and scope of the inventory search was unconstitutional. (Doc. 70 at 24-32.) The GTPD inventory policy states that when a vehicle has been lawfully seized or impounded, the officer "will" conduct an inventory search of the vehicle, and that "[i]nventorying a vehicle before impoundment serves three purposes: 1. Protection of the owner's property while it remains in police custody; 2. The protection of the Department from potential danger; 3. The protection of the Department against false claims of stolen or lost property." (Gov. Ex. 16 at 5.) As to the scope of the search, the policy states that it "may extend to all areas of the vehicle in which personal property or hazardous materials may reasonably be found, including but not limited to the passenger compartment, trunk, and glove compartment. . . . All closed containers found within the vehicle will be opened for purposes of the inventory." (*Id.* at 6.) As to recording the contents found during the search, the policy states:

If the officer has access to the trunk, he or she will also record spare tires, jacks, and other contents. . . . Closed and locked containers will . . . be logged on the impound report as such. . . . Whenever a vehicle is impounded at the direction of an officer, he or she will complete an incident (or accident) report and enter the required information in the online 'Vehicle Information-sharing and Notification Service' (VINS) database to ensure all required information is gathered and that all items of value are properly accounted for. On the VINS form, the officer will make note of all (portable) personal property present in the vehicle (e.g., clothing, textbooks, audio/video media, etc.), installed accessories (e.g., audio equipment and other electronic devices), and the vehicle's overall condition. . . . The impounding officer will turn in to the supervisor: the Incident or Accident Report, and the VINS form.

(*Id.* at 6-7.)

Defendant points out that the officers encountered numerous items when searching his vehicle, such as clothing, shoes, bags, notebooks, a box, a covered tin pan, and papers, but the only property items listed by Ofc. Jornlid on the Incident Report were the switch-modified Glock, a Glock magazine, ammunition, the fake ID, a scale, an iPhone, and house keys on the evidence and property receipt. (Doc. 70 at 30; Def. Ex. 3 at 2-4.) Additionally, the only property item Ofc. Johnson listed on the Tow Report/VINS form was Defendant's wallet. (Doc. 70 at 30-31; Def. Ex. 4; Tr. 64:13-19; 68:22-69:5 (Ofc. Jornlid's testimony that the Tow Report is the same document as the VINS form).) The fact that these documents were not filled out pursuant to GTPD's inventory policy, Defendant argues, shows that the GTPD officers searched Defendant's car for evidence rather than to inventory the contents of the vehicle. (Doc. 70 at 30-31.)

The government responds by pointing to *United States v. O'Bryant*, in which the Eleventh Circuit Court of Appeals rejected this argument. 775 F.2d

1528, 1534 (11th Cir. 1985) ("We also reject O'Bryant's contention that the inventory search exception to the general prohibition against warrantless searches was violated because [the officer] did not prepare a complete list of the briefcase's contents."). *See also United States v. Garay*, 938 F.3d 1108, 1112 (9th Cir. 2019) ("That the officer did not complete the inventory list that ordinarily would be completed as part of a department inventory search is not, on its own, a material deviation from policy."); *United States v. Loaiza-Marin*, 832 F.2d 867, 869 (5th Cir. 1987) (per curiam) ("failure to compile the written inventory does not render the inventory search invalid"); *United States v. Trullo*, 790 F.2d 205, 206 (1st Cir. 1986) ("We will not hold that the officer's failure, technically, to follow the inventory form procedures for valuables meant it was not an inventory search."); *United States v. Richardson*, 2000 WL 1273425, at *2 (4th Cir. Sept. 5, 2000) (per curiam) ("[T]he failure to complete an inventory list does not render suspect either the motive for conducting the search or the reasonableness thereof."). The court in *O'Bryant* explained that "'[t]he reasonableness of an official invasion of the citizen's privacy must be appraised on the basis of the facts *as they existed at the time that invasion occurred*.'" 775 F.2d at 1534 (quoting *United States v. Jacobsen*, 466 U.S. 109, 115 (1984)) (emphasis added). In other words, "[e]ven if police fail to adhere to standardized procedures, the search is nevertheless reasonable provided it is not a pretext for an investigatory search." *U.S. v. Taylor*, 636 F.3d 461, 465 (8th Cir. 2011) (citing *United States v. Hall*, 497 F.3d 846, 852 (8th Cir. 2007); *Whren v. United States*, 517 U.S. 806, 812 (1996) (noting that an officer's motive may invalidate objectively justifiable behavior in the context of an inventory search)). To show that the search was investigatory,

"'something else' must be present to suggest that the police were engaging in their criminal investigatory function, not their caretaking function, in searching the defendant's vehicle." *Id.* (quoting *United States v. Rowland*, 341 F.3d 774, 780-81 (8th Cir. 2003)).

As evidence of this "something else," Defendant points to a statement Ofc. Jornlid made to another officer towards the end of the search: "The only thing I found was the scale. That was in the glove compartment. But there hasn't been anything else yet." (Gov. Ex. 2 at 32:48-33:16.) The government does not respond to this argument, (*see* Doc. 81), but the Court is nevertheless unpersuaded by it. For context, Ofc. Jornlid's statement was made approximately 10 minutes after he began his search of the vehicle and after Ofc. Johnson found the gun under the driver's seat. (Gov. Ex. 2 at 21:45-33:16.) In that context, this comment does not show that the officers searched Defendant's vehicle for the purpose of finding incriminating evidence. Rather, it seems to be part of a conversation between the officers about incriminating evidence they happened to find in the vehicle. Moreover, as the government argues, the GTPD officers were clear and consistent about their decision to tow and impound Defendant's car because he did not have car insurance—there is no evidence which suggests that the officers had any belief, prior to conducting the search, that they would find incriminating evidence in the vehicle. (Doc. 81 at 21-22.) Pursuant to the GTPD inventory policy, this decision meant that the officers were required to conduct an inventory search of the car. (Gov. Ex. 16 at 5.)

Defendant additionally relies on three cases to support his argument—*Taylor*, *Khoury*, and *Lyons*. All three are distinguishable from this case. In *Taylor*,

28

the court concluded that the inventory search of the defendant's vehicle was merely a pretext for an investigatory search, noting that the "something else" which rendered the search unreasonable was the officer's testimony at the suppression hearing that she based the traffic stop of the defendant, his arrest, the towing and impounding of his vehicle, and the inventory search of his vehicle on her belief that he had narcotics therein, and that she would not have done these things had she not held this belief. 636 F.3d at 465. Here, there is no such testimony.

In *Khoury*, an officer inspected the defendant's notebook through a cursory search of its pages and determined that it had no evidentiary value. 901 F.2d at 959. Thereafter, the officer examined the notebook a second time and decided at that point that it had evidentiary value. *Id.* The court found that this second examination was a Fourth Amendment violation because the officer could have sought a warrant to search the notebook further but failed to do so, and he conducted the second search "despite the absence of a valid inventory or exigent circumstances exception." *Id.* These facts are not analogous to the facts here.

In *Lyons*, the court held that the purported inventory search of a backpack belonging to the defendant, who was a car passenger during a traffic stop, was investigatory and therefore unconstitutional. *United States v. Lyons*, No. 121CR00398VMCLTW, 2023 WL 4566529, at *1, 5 (N.D. Ga. July 14, 2023). During the traffic stop, officers arrested the defendant pursuant to an active arrest warrant, took him approximately 10 feet from the car, and then conducted a purported inventory search of his backpack, which was sitting on the car's passenger side floor. *Id.* To justify the search, the government relied on the police

department's prisoner search policy, which troubled the court because it did not provide for or justify inventory searches. *Id.* at *4. As a result, the court found that the officers' inventorying of the bag was neither routine nor required by any policy. *Id.* Additionally, the prisoner search policy "align[ed] more closely with a search incident to an arrest," and the justifications for that type of search "only apply 'if the arrestee is within reaching distance of the' area or items to be searched." *Id.* (quoting *Arizona v. Gant*, 556 U.S. 332, 351 (2009)). As stated previously, the defendant was not within reaching distance of the bag when it was searched. The court was also troubled by the inventory list, which included only incriminating evidence – a gun, gun magazine, ammunition, and the backpack itself – and not any of the other items inside the bag such as a prayer mat, a Quran, a tape measure, and cigarettes. *Id.* at *5. The court found that this list "bolster[ed]" the conclusion that the search was investigatory, though the court explicitly stated that it was "not holding that an inventory search is *per se* invalid if the inventory list fails to include every single item." *Id.* Finally, the court noted that the searching officer "disposed of [the d]efendant's unopened bottles of alcohol rather than inventorying them[,]" which clearly "does not protect the owner's property or protect the police from disputes over lost property." *Id.* (internal quotation marks omitted). While all these facts seem to have informed the court's conclusion that the search was invalid, the court ultimately reached this conclusion because the search was not "conducted pursuant to standardized criteria or established routine." *Id.* (internal quotation marks omitted).

Here, on their inventory lists, Ofcs. Jornlid and Johnson did not include most of the items that were in Defendant's vehicle during the search. And the items they did list, with two exceptions, were incriminating. While the Court may be concerned about the officers' clear failure to properly list all items found during the inventory search, this failure is not dispositive. The Court also must consider all the other facts and circumstances of this matter, especially that the search was conducted pursuant to GTPD policy. Upon this consideration, the Court finds that the search was ultimately a reasonable inventory search.

### 3.   Statements to Georgia Tech Officers

Defendant argues that his statements to the Georgia Tech police officers should be suppressed because: (1) he invoked his right to remain silent; (2) Sergeant Leao "did not honor that invocation;" and (3) Defendant did not waive his right to remain silent. (Doc. 70 at 32-3.) The government bears the burden of showing that the defendant's in-custody statements were obtained in compliance with the dictates of *Miranda v. Arizona*, 384 U.S. 436 (1966), and were otherwise voluntary. *Missouri v. Seibert*, 542 U.S. 600, 608 n.1 (2004); *Colorado v. Connelly*, 479 U.S. 156, 168 (1986); *Miranda*, 384 U.S. at 475. Under *Miranda*, "evidence obtained as a result of a custodial interrogation is inadmissible unless the defendant had first been warned of his rights and knowingly waived those rights." *United States v. Parr*, 716 F.2d 796, 817 (11th Cir. 1983). The government must prove by a preponderance of the evidence that the defendant waived his rights knowingly and voluntarily.[5] *United States v. Glover*, 431 F.3d 744, 748 (11th Cir. 2005).

---

[5] Separate and apart from compliance with *Miranda*, the government also must establish that a custodial defendant's statements were voluntary. *United*

First, no one disputes that Sgt. Leao read Defendant his *Miranda* rights. Defendant, however, argues that he sufficiently invoked his right to remain silent such that all questioning should have ceased. It is true, as Defendant points out, that he twice told law enforcement that he wanted to invoke his *Miranda* rights and not speak to law enforcement. What Defendant fails to recognize, however, is that each time he did, he immediately attempted to engage the officers in conversation, and that, throughout the entirety of Defendant's custody that night, he continually tried to talk to the officers — sometimes even begging them to speak to him. The result was an (unequivocally) equivocal invocation. And because it was equivocal, law enforcement was allowed to speak to him. *See United States v. Acosta*, 363 F.3d 1141 (11th Cir. 2004) ("A suspect must articulate his desire to cut off questioning with sufficient clarity that a reasonable police

---

*States v. Sims*, 719 F.2d 375, 378 (11th Cir. 1983) ("First, the court considers whether the government has complied with the *Miranda* requirements. Upon finding compliance with *Miranda*, the court then rules on the confession's voluntariness."); *see also Jarrell v. Balkcom*, 735 F.2d 1242, 1252 & n.11 (11th Cir. 1984) (observing that although *Miranda* and *Jackson v. Denno*, 378 U.S. 368 (1964), protect Fifth Amendment rights, *Jackson* "raises an issue distinct from the *Miranda* question in determining a confession's admissibility ... [and] [t]hus, even if a court finds compliance with *Miranda*, the court must still rule on the confession's voluntariness"). Defendant's argument here focuses on the *Miranda* portion of the analysis, but regardless, whether the analysis is under the due process clause or under the dictates of *Miranda*, the voluntariness test is the same. *Miller*, 838 F.2d at 1538 ("Certainly the waiver of *Miranda* rights must also be voluntary to be effective against a defendant, and the Supreme Court in *Connelly* explained that "voluntariness in the context of a *Miranda* waiver means the same things as 'voluntariness' in the due process context, i.e., freedom from official coercion." (citing *Connelly*, 107 S. Ct. at 523).

office in the circumstances would understand the statement to be an assertion of the right to remain silent. If the statement is ambiguous or equivocal, then the police have no duty to clarify the suspect's intent, and they may proceed with the interrogation) (quoting *Coleman v. Singletary*, 30 F.3d 1420, 1424 (11th Cir. 1994)).

When Defendant was arrested, officers placed him in the back seat of the patrol car, and Sgt. Leao explained that he was being arrested for obstruction, battery, and possession of a false identification card. Immediately after he was arrested, Defendant tried to initiate a conversation, and Sgt. Leao read him his *Miranda* rights. Defendant said that he understood his rights and did not want to speak to law enforcement, but then immediately asked Sgt. Leao, "What did I do?," despite the fact that Sgt. Leao already told Defendant why he was being arrested. Sgt. Leao explained that law enforcement could not talk to Defendant if Defendant was invoking his right to remain silent, but Defendant again asked Sgt. Leao, "What . . . did I do?" When Sgt. Leao was in and out of the patrol car, Defendant attempted to talk to him whenever he opened the car door. Defendant also attempted to talk to Sgt. Leao during the car ride to the police station and, once there, again attempted conversation when he was being placed in the sallyport. Given these repeated attempts, Sgt. Leao would have been entitled to answer Defendant's questions and continue a conversation with him; instead, at no point during any of these attempted communications did Sgt. Leao attempt to interrogate Defendant.

It was only after Defendant had repeatedly posed questions to law enforcement for at least an hour that Sgt. Leao asked Defendant if he remembered his *Miranda* rights and confirmed that Defendant did indeed want

to waive them. Sgt. Leao was not required to clarify Defendant's previously ambiguous conduct, but he did so nonetheless. *See Coleman*, 30 F.3d at 1425 (recognizing that the Eleventh Circuit's old rule requiring that a police officer clarify a defendant's intention when the defendant's assertion of his right to remain silent is ambiguous or equivocal is no longer good law). Only after Sgt. Leao clarified that Defendant wanted to talk did Sgt. Leao begin the interrogation.

Moving to the second part of the test — voluntariness — the government must prove that Defendant's waiver was "the product of a free and deliberate choice rather than intimidation, coercion, or deception," and was made "with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Moran v. Burbine*, 475 U.S. 412, 421 (1986). The focus of this inquiry is on whether the defendant was coerced by the government into waiving his rights: "[t]he relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion or deception." *Connelly*, 479 U.S. at 170 (alteration and internal quotation marks omitted). The Court should consider the totality of the circumstances in assessing whether any police conduct was "causally related" to the waiver. *See Miller v. Dugger*, 838 F.2d 1530, 1536 (11th Cir. 1988). This totality-of-the-circumstances test directs the Court ultimately to determine whether a defendant's waiver was the product of "an essentially free and unconstrained choice." *United States v. Garcia*, 890 F.2d 355, 360 (11th Cir. 1989). *See Connelly*, 479 U.S. at 163 n.1; *Miller*, 838 F.2d at 1536; *United States v. Castaneda-Castaneda*, 729 F.2d 1360, 1362-63 (11th Cir. 1984).

Defendant argues that his waiver was not voluntary because Sergeant Leo engaged in "improper trickery" and "unlawful coercion" to get him to speak to law enforcement, and that Defendant did not knowingly waive his *Miranda* rights because he was intoxicated. First, regarding trickery, Defendant alleges that Sgt. Leao improperly deceived Defendant when he "approached Mr. Barrow and asked him if he was *still* willing to speak with him, when he knew that Mr. Barrow had said only minutes earlier that he did not want to talk with them." (Doc. 70 at 36-37.) But, as explained above, Sgt. Leao talked to Defendant only after Defendant repeatedly attempted to engage law enforcement in conversation and only after law enforcement confirmed that Defendant did indeed want to speak to them. In this context when Sgt. Leao asked if Defendant "still" wanted to talk, Sgt. Leao was simply trying to clarify Defendant's intent, and was not, as Defendant suggests, some sort of trickery.

In addition, Defendant's statements during the interview show that his statements were voluntarily made. For example, Defendant offered that someone named "Q" may have left the gun in the car, and when Sgt. Leao prepared to leave the interview room, Defendant said, "Please, man! Officer, what else can I give you besides that person?" Later, Defendant asked, "What can I do to save myself, to not ruin my life," and "That's it? I can't do anything to save myself, to help myself? Can you talk to me about some more things real quick? . . . Can you just tell me what it's looking like?" And still later, "Can y'all hear me out? Can we talk or something?" These statements show an individual seeking to provide law enforcement information to lessen his personal consequences; in other

words, Defendant's actions show someone who was using his own free will to try to cooperate.

With respect to coercion, Defendant alleges that Sgt. Leao coerced Defendant to talk when he said that Defendant "was facing serious federal charges and facing a lengthy period of incarceration due the presence of the firearm with the alleged switch in his car." (Doc. 70 at 36-37.) Sufficiently coercive conduct normally involves subjecting the accused to an exhaustingly long interrogation, the application of physical force or the threat to do so, or the making of a promise that induces a confession. *See Connelly*, 479 U.S. at 163 n.1; *Miller*, 838 F.2d at 1536; *Castaneda-Castaneda*, 729 F.2d at 1362-63. Here, the officers truthfully informed Defendant of the potential consequences of his crime. This does not render a *Miranda* waiver or subsequent statement involuntary. *United States v. Johnson*, 379 F. App'x 964, 968-69 (11th Cir. 2010); *United States v. Jones*, 32 F.3d 1512, 1517 (11th Cir. 1994); *United States v. Davidson*, 768 F.2d 1266, 1271 (11th Cir. 1985)).

Finally, regarding Defendant's argument that he was intoxicated, the officers testified that Defendant was able to ask questions, answer questions, and follow a conversation. They never saw Defendant consume any intoxicants while in custody. And Defendant's conversations with Sgt. Leao took place between approximately 90 minutes and 150 minutes after the traffic stop. Defendant was never threatened or promised anything to get him to speak. There is no evidence that officers took advantage of Defendant because he was allegedly intoxicated. *See United States v. Harris*, No. 4:11-cr-18-HLM-WEJ, 2011 WL 5514003, at *7 (N.D. Ga. Oct. 21, 2011), *adopted by* 2011 WL 5514058, at *7-8 (N.D. Ga. Nov. 10,

2011) (finding that statement was voluntary even when defendant appeared to be under the influence of drugs because there was no evidence that the defendant lacked sufficient mental capacity to understand and waive his rights). Accordingly, the Court **RECOMMENDS** that Defendant's motion to suppress the statements he made to the Georgia Tech police officers, (Docs. 21, 25), be **DENIED**.

### 4. Statements to ATF Officers

#### a. Statements to ATF Officers at Defendant's Home

When the Georgia Tech police officers brought Defendant to the Fulton County jail, he was booked for violating certain Georgia criminal statutes, including possession of a dangerous weapon, in violation of O.C.G.A. § 16-11-123. Defendant argues that, when the two ATF agents visited Defendant at his home on June 27, 2023, after he had been released from state custody, his Sixth Amendment right to counsel had already attached on the state charges. (Doc. 70 at 37-40.) Thus, argues Defendant, because the federal agents questioned him about the same offense for which the state charges were pending, the federal agents violated his Sixth Amendment right to have counsel present when they interviewed him. (*Id.*) Defendant, however, recognizes that Eleventh Circuit law — *United States v. Burgest*, 519 F.3d 1307 (11th Cir. 2008) — defeats his argument. (Doc. 70 at 40) (acknowledging that "the Eleventh Circuit has held that '[w]here conduct violates laws of separate sovereigns, the offenses are distinct for purposes of the Sixth Amendment.'"). Defendant explains that he makes his argument simply to preserve it should the Supreme Court one day overturn this Circuit precedent. (Doc. 70 at 40.) Accordingly, this Court **RECOMMENDS** that

Defendant's motion to suppress the June 27, 2023, statements he made to ATF agents at his home, (Docs. 21, 25), be **DENIED**.

      **b.**      **Statements to ATF Officers at ATF Field Office**

When TFO Maldonado and SA Bazin went to Defendant's home on June 27th, they told him that he was facing 5 years' imprisonment for possessing the gun, but that he could receive an additional 10 to 15 years' imprisonment for the California shootings that the gun was suspected to be connected to; that they did not want to "mess up" Defendant's life; and that "the more you can help us, the better it looks." Three days later, on June 30, 2023, when SA Bazin, TFO Maldonado, and other officers returned to Defendant's home and arrested him on a federal complaint, Defendant says that he was "[u]ndoubtedly stunned by the sequence of events." (Doc. 70 at 43.) And so, argues Defendant, his preface of "I don't know if this helps or not, but . . . " before he told law enforcement that the gun box was in his house, "shows that his statement was connected to SA Bazin's inducement – help the officers to avoid messing up his life." (*Id.*) Specifically, according to Defendant, his "statement was induced by a promise that was either express or implied from Agent Bazin to grant him leniency if he provided information to assist officers with their investigation," and was thus not voluntary. (*Id.*)

First, Defendant's statement was spontaneously uttered; it was not made in response to any police questioning, and thus the absence of *Miranda* warnings is not relevant. Nor did SA Bazin's prior statements constitute unlawful inducement thereby rendering Defendant's spontaneous statement involuntary. To begin, law enforcement is permitted to inform a suspect that "cooperating

with the government would be in his best interest," and doing so does not render a subsequent statement involuntary. *United States v. Hipp*, 644 F. App'x 943, 947 (11th Cir. 2016); *United States v. Nash*, 910 F.2d 749, 753 (11th Cir. 1990) (statement that cooperating defendants generally "fared better time-wise" did not amount to illegal inducement). Nor does, as explained above, truthfully commenting on the potential severity of a sentence that a suspect may face generally lead to an involuntary waiver or statement. *United States v. Davidson*, 768 F.2d 1266, 1271 (11th Cir. 1985) (law enforcement assurance that "the accused's cooperation would be passed on to judicial authorities and would probably be helpful to him is not a sufficient inducement so as to render a subsequent incriminating statement involuntary"); *United States v. Quinn*, 123 F.3d 1415, 1423-24 (11th Cir. 1997) (police did not improperly induce defendant's confession by telling him that "he was facing a 46-year sentence but might receive a more favorable sentence if he cooperated" and that "it would be more difficult to cooperate once an attorney had been appointed"); *United States v. Mendoza-Cecelia*, 963 F.2d 1467, 1475 (11th Cir. 1992) ("[D]iscussions of realistic penalties for cooperative and non-cooperative defendants … are normally insufficient to preclude free choice.") (internal citation omitted); *United States v. Ballard*, 586 F.2d 1060, 1063 (5th Cir. 1978) ("[T]elling the [defendant] in a noncoercive manner of the realistically expected penalties and encouraging [him] to tell the truth is no more than affording [him] the chance to make an informed decision with respect to [his] cooperation with the government."). In contrast, "the kinds of deception that are generally deemed to trigger suppression are lies about a defendant's legal rights (*i.e.*, 'you must answer our questions'), false promises (*i.e.*, 'whatever you say will

be just between us'), or threats (*i.e.*, 'if you don't talk, you won't see your family for a very long time')." *United States v. Graham*, No. 3:13-cr-11-TCB, 2014 WL 2922388, at *9 (N.D. Ga. June 27, 2014) (internal quotation marks and citation omitted). That is not what happened here. *Cf. United States v. Beale*, 921 F.2d 1412, 1435 (11th Cir. 1991) (government failed to establish that Spanish-speaking suspect's *Miranda* waiver was voluntary where agents told him his statements "would not hurt him," thereby effectively nullifying the *Miranda* warnings). This is not what happened here.

Defendant cites to *United States v. Jones*, 32 F.3d 1512, 1516-17 (11th Cir. 1994), to support his argument that unlawful coercion includes making a promise that induces a confession. (Doc. 91 at 25.) *Jones*, however, supports this Court's conclusion that the agents did nothing improper here. In *Jones*, agents told the defendant that he would be prosecuted in federal court, where defendants generally serve their full incarceration time, and that an additional five years of imprisonment could be added to his prison time since he possessed a weapon when committing the crime. *Id.* at 1517. The Court characterized these statements as, simply, "true comments." *Id.* This Court thus **RECOMMENDS** that Defendant's motion to suppress statements he made at the ATF Field Office, (Docs. 21, 25), should be **DENIED**.

## 5. <u>Evidence from Search of Home</u>

Defendant asserts that the search warrant to search his home was supported by the singular fact of Defendant's statement saying that the gun box was in his home. (Doc. 70 at 44.) Because that statement was involuntary, Defendant argues, the search warrant is tainted, and that without the statement,

the search warrant does not provide sufficient probable cause to have been issued. (Doc. 70 at 44). The government, of course, argues in response that the statement was not involuntary, and thus the search warrant is valid. (Doc. 81 at 34). The Court agrees with the government because, as explained above, Defendant's spontaneous statement was voluntary.

Alternatively, though, the government argues that, even if the statement was involuntary, it does not necessarily follow that the evidence seized during execution of the search warrant must be suppressed, given the *Leon* good-faith exception. (Doc. 81 at 34). In *United States v. Leon,* 468 U.S. 897 (1984), the Supreme Court established a "good faith" exception to the exclusionary rule to prevent suppression of items seized pursuant to a search warrant. Specifically, under *Leon*, the good-faith exception to the rule requiring suppression of evidence for Fourth Amendment violations keeps evidence from being suppressed when law enforcement officers obtain evidence through objective, good-faith reliance on a facially valid warrant. *Id.* at 913; *see also United States v. Gonzalez,* 969 F.2d 999, 1004 n. 4 (11th Cir.1992). Nevertheless, "it is clear that in some circumstances the officer will have no reasonable grounds for believing that the warrant was properly issued." *Leon*, 468 U.S. at 922–23. Thus, *Leon's* good-faith exception does not apply to the following four situations: (1) where the magistrate in issuing a warrant was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth; (2) where the issuing magistrate wholly abandoned his judicial role; (3) where the affidavit supporting the warrant is so lacking in indicia of probable cause as to render official belief in its existence entirely

unreasonable; and (4) where, depending upon the circumstances of the particular case, a warrant is so facially deficient—i.e., in failing to particularize the place to be searched or the things to be seized—that the executing officers cannot reasonably presume it to be valid. *United States v. Robinson*, 336 F.3d 1293, 1296 (11th Cir. 2003). None of these situations exists here. In addition, Defendant's fruit of the poisonous tree argument also fails given that Defendant's statement at the ATF office — and indeed all of Defendant's statements — were voluntarily and lawfully made. The Court thus **RECOMMENDS** that Defendant's motion to suppress evidence seized from his home, (Doc. 26), be **DENIED**.

### 6.    Evidence from Search of Cell Phones

Defendant argues that the two search warrants authorizing the government to search and seize evidence from his cell phones should be suppressed. Specifically, he asserts that: (1) the affidavit fails to establish probable cause; (2) information presented in the affidavit is "tainted by Constitutional violations"; and (3) information presented in the affidavit is "undermined by information that the affiant did not include." (Doc. 74 at 3-4.)

A magistrate judge issuing a search warrant must "make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him . . . , there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983); *United States v. Miller*, 24 F.3d 1357, 1361 (11th Cir. 1994) (A realistic and commonsense approach encourages use of the warrant process.). Probable cause can be inferred by considering the type of crime, the nature of the items sought, the suspect's opportunity for concealment, and normal inferences about where a

criminal might hide the fruits of his crime. *See United States v. Lebowitz*, 647 F. Supp. 2d 1336, 1354 (N.D. Ga. 2009), *aff'd*, 676 F.3d 1000 (11th Cir. 2012) (citation omitted). A court reviewing the issuing court's probable cause determination employs a deferential rather than *de novo* standard of review. *Massachusetts v. Upton*, 466 U.S. 727, 728, 733 (1984) (citing *Gates*, 462 U.S. at 236; *United States v. Ventresca*, 380 U.S. 102, 108 (1965)); *Miller*, 24 F.3d at 1363 (reviewing courts owe "substantial deference to an issuing magistrate's probable cause determinations"). "Courts reviewing the legitimacy of search warrants should not interpret supporting affidavits in a hypertechnical manner; rather a realistic and commonsense approach should be employed so as to encourage recourse to the warrant process and to promote the high level of deference traditionally given to [issuing judges] in their probable cause determinations." *Miller*, 24 F.3d at 1361.

Here, sufficient probable cause existed to support the search warrants. The affidavit explained that the machine gun was found in Defendant's car on April 8, 2023, and that a NIBIN check revealed a lead between cartridge casings from this gun's test firing and cartridge casings from a shooting incident in Oakland, California on June 25, 2021, and a shooting incident in San Francisco, California on February 26, 2022. (Doc. 77-1 at 11-12.) The affidavit stated that a NIBIN lead is an "unconfirmed (presumptive) association between two or more pieces of ballistic evidence" and that "[t]hese potential associations are identified by either a firearms examiner or a trained NIBIN technician." (*Id.* at 11.) The affidavit further explained that Defendant is a former California resident who was arrested in Union City, California in 2005 and Oakland, California in 2005, 2006,

2007, 2008, and 2012. (*Id.*) Union City is 15 miles south of Oakland, which is adjacent to San Francisco. During the knock-and-talk, Defendant admitted to purchasing the firearm in August 2022. (*Id.* at 12.) A search of an open-source database revealed two current phone numbers, one identified by Defendant as his phone number during the knock-and-talk, and one associated with Defendant's address. (*Id.*) Both of these cell phone numbers have San Francisco area codes. (*Id.*) The application sought the cell phone's historical cell phone location data to identify where Defendant's phones were during the two California shootings. (*Id.* at 12-13.) The affidavit asserted that Defendant's "involvement in the shootings" would "be evidence of Defendant's continued knowing possession of the firearm that was seized from him on April 8, 2023." (*Id.*) With these facts, the government showed a fair probability that evidence would be found on the phones.

Defendant argues that the search warrants are "tainted" by the affidavit's inclusion of evidence unconstitutionally attained. (Doc. 74 at 6-7.) Specifically, Defendant points to law enforcement's seizure of the gun and the second identification card from his wallet, his arrest, and the towing and searching of his car on April 8th, law enforcement's questioning of him on June 27th, and his statements at the ATF Field Office. (*Id.*) He argues that the evidence resulting from those events should not be considered as the basis for probable cause to search his phones. (*Id.*) But as explained above, there was nothing unlawful about Defendant's arrest, the subsequent searches, or the subsequent statements. Thus, the information properly served as a basis for probable cause to search the cell phones.

Defendant also argues that the establishment of probable cause "is further undermined" by the "limitations of NIBIN leads that were not disclosed to the Magistrate who reviewed the applications for the search warrants." (*Id.* at 7.) Defendant asserts that the limitations not disclosed are that NIBIN leads are to be used "for investigative purposes only" and "cannot be used for the establishment of probable cause or for any court-related purpose until evidence has been confirmed by a microscopic comparison." (*Id.*) (quoting *United States v. Wondie*, No. CR18-315 RAJ, 2021 WL 5987099, *3 (W.D. Wash. Dec. 17, 2021)); (Doc. 90 at 3) (citing Bureau of Alcohol, Tobacco, Firearms and Explosives, Fact Sheet – National Integrated Ballistic Information Network (March 2023), https://www.atf.gov/resource-center/fact-sheet/fact-sheet-national-integrated-ballistic-information-network). In addition to Defendant citing *Wondie* and an ATF Fact Sheet, the government also provided a third document to give context to this issue: the NIBIN lead sheet itself, on which is written "[t]his document should not be relied on as evidence, and investigators should collect original reports for any evidentiary purposes." (Doc. 80-1.)

Starting with the NIBIN lead sheet, there was no reason for TFO Maldonado to include in his affidavit that the lead sheet instructs that "[t]his document should not be relied on as evidence and investigators should collect original reports for any evidentiary purposes." A review of the NIBIN lead sheet makes clear that the phrase "this document" means just that: "this document." In other words, it means the lead sheet itself. That sheet provides a summary of the NIBIN search and, with respect to the California shootings, includes the law enforcement agencies investigating those shootings, the law enforcement case

numbers, the dates and locations of the shootings, and a brief summary of the shootings; it does not offer any substantive evidence on the shootings or provide any of the underlying police documents with respect to them. (*Id.*) Thus, the admonition that investigators "should collect original reports for evidentiary purposes" means that law enforcement should collect the original police reports. And here, it appears that TFO Maldonado did just that. The search warrant affidavit describes the shootings, and this description includes facts not contained in the NIBIN lead sheet. (Doc. 77-1 at 8-9.) In addition, TFO Maldonado specifically cites to what the police reports say. (*Id.*) Thus, TFO Maldonado did exactly what the lead sheet's admonition instructed him to do, and there was no need to explain the lead sheet's admonition in the affidavit.

Second, a Fact Sheet on ATF's website explains that "a NIBIN lead is an unconfirmed potential association between two or more pieces of firearm ballistic testing." Bureau of Alcohol, Tobacco, Firearms and Explosives, Fact Sheet – National Integrated Ballistic Information Network (March 2023), https://www.atf.gov/resource-center/fact-sheet/fact-sheet-national-integrated-ballistic-information-network. TFO Maldonado's affidavit said that "a NIBIN lead is an unconfirmed (presumptive) association between two or more pieces of firearm ballistic testing" and that these "potential associations" are identified by either a firearms examiner or a trained NIBIN technician. (Doc. 77-1 at 11-12.) The affidavit thus informed the magistrate judge that a lead is "unconfirmed" and described it as a "potential association," just like the ATF Fact Sheet explains.

Defendant cites *Wondie*, a case from the Western District of Washington, to

support his argument. In *Wondie*, the defendant was being investigated for murder, and the assigned detective recovered shell casings from the crime scene and had them entered into NIBIN. 2021 WL 5987099, at *2. The resulting NIBIN lead sheet contained a disclaimer saying that it was "a notification of a presumptive investigation lead"[6] and explaining that evidence "may be confirmed by microscopic comparison when requested for a formal report." *Id.* The detective did not submit the evidence for a formal evaluation, so the "lead" never became a confirmed "hit." *Id.* Nevertheless, in her affidavit, the detective stated that "forensic examination *has established* that shell casings recovered from the scene *matched* a gun owned by defendant." *Id.* (emphasis in original). And later the detective wrote, "[d]etectives learned through NIBIN testing that the firearm used to shoot and kill the victim was the same firearm linked to two Seattle Police Cases." *Id.* These statements were patently false. And indeed, the detective ultimately admitted so to the court. *Id.* at *3. That is not what TFO Maldonado did here. The affidavit in this case explained that a firearms examiner would need to conduct a microscopic comparison before "the association between the firearm ballistic evidence" could be confirmed. There was thus no misrepresentation.

Even if the search warrants were found lacking, that does not end the matter. As explained above, *Leon* established a good faith exception to the

---

[6] While the NIBIN lead sheet produced in this case did not contain the word "presumptive" like the NIBIN lead sheet in *Wondie*, TFO Maldonado used the word "presumptive," along with "unconfirmed" and "potential associations," in his affidavit. It seems reasonable that the NIBIN lead sheets used over time would include these different phrases and, in context, it helps explain TFO Maldonado's use of the word "presumptive" in his affidavit here.

exclusionary rule. 468 U.S. at 913. Defendant claims that the first and third exception to the *Leon* good faith doctrine apply here. (Doc. 90 at 6.) That is, according to Defendant, under the first exception, the magistrate judge was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard for the truth, and that, under the third exception, the warrant was so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable. (*Id.*)

This Court rejects the third exception because, as explained above, sufficient probable cause existed. Turning next to the first exception, it is important to note that Defendant never asked for a *Franks* hearing. Where a defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause, then the Fourth Amendment requires a hearing to be held at the defendant's request. *Franks v. Delaware*, 438 U.S. 154, 156 (1978). And at that hearing, the defendant must show perjury or reckless disregard by a preponderance of the evidence. *Id.* Defendant never requested a hearing to meet his burden of proof. (*See* Dkt.) Still, at the evidentiary hearing for Defendant's motions to suppress evidence and statements on November 9th, defense counsel asked TFO Maldonado questions about the affidavit. There, TFO Maldonado readily confirmed that NIBIN leads indicate that the information provided is to be used only for investigative purposes and that ballistics testing should be done for probable cause. (Tr. at 123:6-124:19.) TFO Maldonado also stated that "the presumptive lead basically

indicates that it's more of a statement of a high probability that the firearm is involved, but as far as actual confirmation, no." (*Id.*) This is exactly what his affidavit said. At no point during the cross-examination was it established that TFO Maldonado engaged in perjury or acted in reckless disregard for the truth. Accordingly, this Court **RECOMMENDS** that Defendant's motion to suppress evidence obtained from Defendant's cell phones through execution of search warrants, (Docs. 23, 74), be **DENIED**.

### III.   <u>CONCLUSION</u>

Accordingly, the Court **RECOMMENDS** the following:

- Defendant's Motion to Suppress Evidence, (Doc. 20), be **DENIED**;

- Motion and Amended Motion to Suppress Statements, (Docs. 21, 25), be **DENIED**;

- Preliminary Motion to Dismiss Indictment Based on *Bruen*, (Doc. 22), be **DENIED**;

- Preliminary Motion to Suppress Evidence Obtained through Execution of Search Warrants, (Docs. 23, 74), be **DENIED**;

- Motion and Amended Motion to Dismiss Indictment for Lack of Jurisdiction, (Docs. 24, 75), be **DENIED**; and

- Motion to Suppress Evidence Obtained through Execution of Search Warrant at Defendant's Residence, (Doc. 26), be **DENIED**.

There are no pending matters before me, and I am aware of no problems relating to the scheduling of this case. **IT IS THEREFORE ORDERED** and **ADJUDGED** that this action be **CERTIFIED READY FOR TRIAL**.

**SO RECOMMENDED** June 7, 2024.

_____
J. ELIZABETH McBATH
UNITED STATES MAGISTRATE JUDGE